# In the United States Court of Federal Claims

No. 12-59C
(Filed: March 13, 2014)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WOODIES HOLDINGS, LLC,

                    *Plaintiff,*

v.

THE UNITED STATES,

                    *Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

> Contract; negotiation; mutual assent; summary judgment; real estate tax; tax adjustment clause.

    *Lynn E. Calkins,* Washington, D.C., for plaintiff.

    *Martin M. Tomlinson*, United States Department of Justice, Civil Division, Washington, D.C., with whom were *Franklin E. White, Jr.*, Assistant Director, *Jeanne E. Davidson*, Director, and *Stuart F. Delery*, Assistant Attorney General, for defendant.

_____

## OPINION

_____

BRUGGINK, *Judge.*

    The dispute in this case arises from the real estate tax provision of a commercial lease between the United States of America and Woodies Holdings, LLC ("Woodies" or "plaintiff"). As lessee, the United States, acting through the General Service Administration ("GSA"), was obligated to reimburse plaintiff, as lessor, for local real estate taxes. The parties' disagreement concerns whether GSA has paid the entire amount due for lease year 2007-2008, which turns on what the parties' agreement dictates with respect to selecting the base year against which to calculate periodic changes in taxes due. Defendant asserts that it is not obligated to reimburse plaintiff for increased amounts paid towards the local real estate taxes for 2007-2008

because the base year plaintiff uses (lease year 2005-2006) was not established through negotiations, plaintiff failed to timely submit documentation that it had paid the real estate taxes, and plaintiff is barred from making the argument that 2005-2006 is the first year the property was appraised at full value because plaintiff did not make that claim to the contracting officer.

The parties filed cross-motions for summary judgment, which are fully briefed.  Oral argument was held on September 19, 2013.  Subsequently, we ordered the parties to supplement the briefing with more formally presented proposed findings of uncontroverted fact and responses thereto.  The matter is now ready for resolution.  For the reasons set out below, we grant in part and deny in part plaintiff's motion for summary judgment and deny in whole defendant's cross-motion.

## BACKGROUND[1]

Woodies has a property interest in the building located at 1025 F Street, NW, Washington, D.C., 20004 ("F Street Building" or "the building"). Between 1996 and 2003, the building was vacant because of zoning restrictions.   The first of five contracts for office space within the building was signed in 2003, but, as of March 29, 2005, the building was still 85% vacant.  On December 13, 2004, Woodies entered into a rental agreement, Lease Number GS-11B-01809 ("Lease 1809"),[2] with the United States, acting through GSA, whereby the government agreed to lease the fourth floor of the F Street Building for the benefit of the Federal Bureau of Investigation, which would move into the fourth floor of the building on June 1, 2005.  Lease 1809 runs through May 31, 2015.

A key provision of the lease is found at Clause 3.2 of the Solicitation. It details the subject of tax adjustment as follows:

A.  Real estate taxes, as referred to in this paragraph, are only those taxes which are assessed against the building and/or the

---

[1] The facts are drawn from the parties' proposed findings of uncontroverted fact, to the extent undisputed, and from the documents included within the parties' appendices.

[2] The lease of concern in this case is one of five that exist between the government and Woodies for different sections of the F Street Building.

land upon which the building is located, without regard to benefit to the property, for the purpose of funding general Government services. . . .

B. Base year taxes as referred to in this paragraph are 1) the real estate taxes for the first 12-month period coincident with full assessment or 2) may be an amount negotiated by the parties that reflects an agreed upon base for a fully assessed value of the property[.]

C. The term 'full assessment' as referred to in this paragraph means that the taxing jurisdiction has considered all contemplated improvements to the assessed property in the valuation of the same. Partial assessments for newly constructed projects or for projects under construction[,] conversion[,] or renovation will not be used for establishing the Government's base year for taxes[.]

D. The Lessor shall furnish the Contracting Officer with copies of all notices which may affect the valuation of said land and buildings for real estate taxes thereon, as well as all notices of a tax credit[,] all tax bills, and all paid tax receipts . . . . All such documents are due within 10 calendar days of receipt except that the proper invoice and evidence of payment shall be submitted within 60 calendar days after the date the tax payment is due from the Lessor to the taxing authority. **FAILURE TO SUBMIT THE PROPER INVOICE AND EVIDENCE OF PAYMENT WITHIN SUCH TIME FRAME SHALL BE A WAIVER OF THE RIGHT TO RECEIVE PAYMENT RESULTING FROM AN INCREASED TAX ADJUSTMENT UNDER THIS PARAGRAPH**.

E. The Government shall 1) make a single annual lump sum payment to the Lessor for its share of any increase in real estate taxes during the lease term over the amount established as the base year taxes or 2) receive a rental credit or lump sum payment for its share of any decreases in real estate taxes during the lease term below the amount established as the base year taxes. . . .

3

App. to Pl.'s Mot. for Summ. J. A45.

On June 1, 2005, the government certified that the entire fourth floor of the building was acceptable for occupancy and began the 10 year lease. At this point, all the tenant improvements for occupancy of the fourth floor had been completed. The parties memorialized the government's acceptance of the premises in Supplemental Lease Agreement ("SLA") Number 1, which also provided that "[t]he anniversary date for calculating operating cost adjustments shall be June 1 of each succeeding lease year, and the Government's obligation to pay adjustments for increases in real estate taxes and base operating cost for services and utilities shall begin [in] accordance with SFO Sections 3.2 and 3.4 of the Lease." *Id.* at A187.

Shahla Motamedi, Woodies' representative, sent a letter to GSA on November 12, 2007, requesting reimbursement for real estate taxes incurred during the period from June 1, 2006 to December 31, 2006, using the 2005 calendar year as the base year. Ms. Motamedi followed up in late April 2008 by contacting Contracting Officer ("CO") Joel Berelson regarding the reimbursement and inquiring about who was responsible within GSA for handling the matter. Mr. Berelson replied that he would find out who was the proper individual at GSA. Ms. Motamedi was then copied on an email sent by Terez Haynes, a GSA employee, to Mr. Berelson, notifying her that the budget analyst "responsible for the leases . . . is Vickey Rinehardt." *Id.* at A346-47. Defendant concedes that Ms. Rinehardt was authorized to communicate with lessors and assist them in processing the request for real estate reimbursement payments. She did not have contracting authority, however. During the course of his deposition, Mr. Berelson also admitted that Ms. Rinehardt was acting within the scope of her authority as she discussed the base year and tax calculation with Ms. Motamedi because "[t]here's often interaction back and forth between [the] budget analysts and lessors to ensure that they have the tax bills and the information needed to process taxes." *Id.* at A292-93.

On April 24, 2008, Ms. Rinehardt emailed Ms. Motamedi back: "There is no problem with the taxes. I just couldn't match to your numbers based on the calculations/formula we use here at GSA." *Id*. at A335, A345. The CO and Ms. Haynes were copied on the email.

Subsequently, Ms. Rinehardt sent Ms. Motamedi a copy of a unilaterally executed SLA Number 4 ("No. 4") with respect to lease year June 1, 2006 through May 31, 2007. It provides:

4

> THIS AGREEMENT, made and entered into this date by and
> between WOODIES HOLDINGS, LLC . . . and the UNITED
> STATES OF AMERICA . . . WHEREAS, the parties hereto
> desire to amend the above Lease [GS-11B-01809].   NOW
> THEREFORE, these parties for the considerations hereinafter
> covenant and agree that the said lease is hereby amended as
> follows: Issued to reflect the annual real estate tax escalation
> provided for in the base lease agreement.

*Id*. at A183.  The agreement lists the following figures: $3,078,137.30 for the comparison year June 1, 2006, through May 31, 2007, $2,125,382.24 for the base year June 1, 2005, through May 31, 2006, $952,755.06 as the increase in real estate taxes from the base year to the comparison year, and $123,667.61 as the amount due to Woodies.

This one-page form contemplates a bilateral amendment to the lease; i.e., it is titled an "AGREEMENT, made and entered into . . . between" the parties "to amend the [] Lease."  The sole purpose of the SLA at issue was to fix the comparison (current) year taxes as against the base year, which in each case was stated to be the period 2005-2006.  There is a place on the SLA for the Lessor's representative to sign.  GSA subsequently sent a series of SLAs with respect to following tax years, all signed by a CO, all using 2005-2006 as the base year.

The cover letter for SLA No. 4 provides, "please find one copy Supplemental Lease Agreement [] No. 4 . . . . [T]he Government has executed the enclosed SLA, which reflects a lump sum to be paid with your next monthly rent check.  Please retain this copy for your files."  *Id*. at A215.  In her deposition, Ms. Motamedi explained that it was Woodies' practice to sign the SLA once it was received and reviewed.  Then, Woodies would place the signed original SLA in its file.

During their initial communications, Ms. Rinehardt and Ms. Motamedi discussed the tax reimbursement for three leases in the F Street Building between GSA and Woodies, one of which was Lease 1809.  Ms. Rinehardt sent Ms. Motamedi three SLAs, one for each of the leases.  Ms. Motamedi responded to the initial round of SLAs by email dated June 10, 2008, telling GSA that she agreed with the calculations for Lease 1809 but wanted the agency's calculations for other leases.  She indicated no disagreement with use

of the June 1, 2005 through May 31, 2006 period as the base tax year for Lease 1809.  Ms. Rinehardt responded with documentation to Ms. Motamedi, which included worksheets prepared by Ms. Rinehardt.  The worksheets also used the June 1, 2005 through May 31, 2006 period as the base tax year.  CO Berelson was copied on a number of the emails between Ms. Motamedi and Ms. Rinehardt during this period and was plainly on notice of plaintiff's interest in confirming the figures used for the base tax year.

On July 1, 2008, Ms. Rinehardt sent an e-mail to Ms. Motamedi with an attachment labeled "Worksheets for Woodies Bldg.xls."  *Id*. at A202.  This worksheet shows the government's calculations that produced the amounts of $2,125,382.24 for the base year and $3,078,137.30 for the 2006 tax year.  The worksheets did not include the formula used by the agency to arrive at those figures, however, and Ms. Motamedi was unable to reconcile some of her own calculations with Ms. Rinehardt's.  On July 2 Ms. Motamedi proposed a meeting between Woodies' representatives and GSA employees so that they could reach an agreement on the numbers.  Ms. Motamedi wrote, "this is very important that we have the correct numbers from [the] beginning (specially [sic] for [the] Base Year)."  *Id*. at A211.  Recognizing that the agency wanted to change from Woodies' proposed calendar year basis to a base year that coincided with the lease-year, Ms. Motamedi also wrote, "[d]ue to change in base year amount from calendar year to lease year, we need to adjust 2007 billings that we sent to you last May."  *Id.*

A meeting was held on July 17, 2008, attended by Ms. Motamedi, Mr. Berelson, Ms. Rinehardt, and other representatives of plaintiff and GSA.  At the meeting, Ms. Motamedi told Mr. Berelson that use of the first year of the lease (June 1, 2005 through May 31, 2006) would be administratively burdensome, but plaintiff would accept it.  The administrative burden presumably refers to the lack of symmetry between the lease year and the district's tax year.[3]  Each six month tax billing period thus straddles two lease

---

[3] The cycles at play are as follows: 1) the lease year runs from June 1 to May 31; 2) the District of Columbia's tax year runs from October 1 to September 30; 3) the District of Columbia bills plaintiff for real estate taxes twice a year, once on March 31 for the period of October 1 through March 31, and then on September 15 for the period of April 1 through September 30; 4) pursuant to the lease, plaintiff must submit to GSA the tax invoice and evidence of payment no later than 60 days after the payment is due.

years.  The result is that each lease year includes periods of time covered by three different tax bills.

Plaintiff asserts that Ms. Rinehardt stated during the meeting that the government's proposed base year comported with the terms of the lease.  That assertion is disputed by the government both as to when the statement occurred and its details.  The government concedes, however, that Ms. Rinehardt, in earlier communications, told Ms. Motamedi that GSA could not agree to a time period covering any period prior to commencement of the lease. The time period subsequently used by GSA and endorsed by plaintiff meets that test.

Subsequent to the meeting, GSA continued to send SLAs covering its calculations of the taxes due, all using the same base year, 2005-2006.  The parties agree that Michelle Parrish and Joel Berelson, both of whom have worked as contracting officers on this project, had the authority to execute the SLAs.  At least one was executed by both parties.  SLA No. 4, covering the period June 1, 2006 through May 31, 2007, was executed by CO Michelle Parrish.  On February 16, 2009, plaintiff received the original of SLA No. 4 executed by Michelle Parrish, a copy of which had been previously sent by Ms. Rinehardt on May 14, 2008.  The original of SLA No. 4 was executed by a Woodies representative and retained in plaintiff's files.  Woodies received payment for the 2006 taxes, in the amount described in SLA No. 4, on October 6, 2008.

Supplemental Lease Agreements No. 8, 9, and 13, were all signed by CO Berelson, and executed in the 2009 through 2011 time period.  They all purport to be an agreement between the government and Woodies confirming the annual real estate tax escalation, and all use $2,125,382.24 for the base year June 1, 2005 through May 31, 2006.  *See id*. at A188-90.

While waiting for the first real estate tax reimbursement (2006-2007) to be paid, Woodies submitted tax information for part of the next lease year, June 1, 2007 through May 31, 2008.  On November 12, 2007, plaintiff timely submitted to GSA evidence of billing and payment of real property tax for the period of April through September of 2007, which included the first four months of lease year 2007-2008.   Then, Woodies timely submitted the necessary documentation covering the next six months of lease year 2007-2008 on May 12, 2008.  This left only two months, April and May, of the 2007-2008 lease year to be included in plaintiff's next submission, which, if timely, would follow within 60 days of the District of Colombia's September 15 tax bill.

Ms. Motamedi sent a letter, which bears the date of November 13, 2008, to request reimbursement for the 2008 real estate taxes.[4]  This letter includes the certified mail-return receipt number 70030500000427584498. According to the letter, copies of the tax bills and proof of payment were enclosed.  Ms. Motamedi explained that her "routine practice for such correspondence was to stamp the package with postage on-site at Douglas Development Corporation and place it with the outgoing deliveries for the U.S. Postal Service."  *Id.* at A338 (declaration of Shahla Motamedi).  Ms. Motamedi recalls following her routine practice with this letter and other GSA correspondence and has "never experienced a situation where a package [she] handled in this manner was not sent out for delivery by the U.S. Postal Service."  *Id.*

The government denies receiving the November 13, 2008 letter because the agency has no record of timely submission. On December 29, 2008, Ms. Motamedi faxed fifteen pages to GSA relating to the 2008 tax bill for Lease 1809.  The cover sheet provided that the faxed documents "were previously sent to the contracting officer."  *Id.* at A219.

The government does not deny receiving the fax, but it informed Woodies in a June 23, 2009 e-mail that GSA would not reimburse it for real estate taxes assessed from June 1, 2007 through May 31, 2008, because its request was untimely.

On June 2, 2011, plaintiff submitted a certified claim to CO Berelson regarding the 2008 real estate tax reimbursement. Plaintiff filed suit in this court on January 30, 2012, seeking reimbursement for the 2008 real estate taxes.

---

[4] An almost identical letter was sent by Ms. Motamedi on November 12, 2007, requesting the 2007 real estate tax reimbursement.  The only differences are the dates and the certified mail-return receipt number.  The government stamped the November 12, 2007 letter as received on November 20, 2007.

**DISCUSSION**

I.     Jurisdiction

There are two jurisdictional questions raised in the government's response to plaintiff's motion for summary judgment. The first concerns whether the claim currently being advanced is the same as the claim originally submitted to the contracting officer.

The lease allows the parties two different ways to come up with a figure for the base tax year: "Base year taxes as referred to in this paragraph are 1) the real estate taxes for the first 12-month period coincident with full assessment or 2) may be an amount negotiated by the parties that reflects an agreed upon base for a fully assessed value of the property[.]" App. to Pl.'s Mot. for Summ. J. A45. Plaintiff's primary reliance during litigation has been on the second method, negotiation. But in response to defendant's arguments that the amount plaintiff offers was a "mistake," plaintiff also relies on the first basis: the first 12-month period coincident with full assessment actually was 2005-2006. Defendant contends that this secondary reliance on the alternative argument (that the amounts included in the SLAs were correct because $2,125,382.24 was the appropriate figure for the first "12-month period coincident with full assessment") is not embraced by the claim originally submitted to the contracting officer and that it therefore is outside the court's jurisdiction. *See D.L. Braughler Co. v. West*, 127 F.3d 1476, 1480 (Fed. Cir. 1997); *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 529 (Fed. Cir. 1987) ("All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.").

This jurisdictional concern is factually groundless. Defendant cites to pages two and four of the claim as limiting the claim only to an argument based on a negotiated value.[5] There is nothing anywhere in the claim, however, which limits it to that particular theory. We can give the government the benefit of the doubt of possible confusion only with respect to some language on page two of the claim with respect to "ongoing, earnest discussions," and "a year of discussions," but these statements are plainly only

---

[5] Defendant's references to the Complaint are irrelevant for purposes of this jurisdictional argument.

a reference to plaintiff's frustration at the fruitless efforts to get GSA to pay the disputed amounts.

Moreover, the claim is four pages long, covers in detail a relatively minor dispute within the parties' contractual relationship, plainly demands, as of right, the precise amount still being litigated, and does so with no reference to the language of the lease differentiating the two possible means to arrive at a base year. In short, it clearly put the CO on notice of the subject of the present claim.

We note, in addition, that it is ironic that the government raises questions about the plaintiff's imprecision as to how the base year was to be calculated when the government, even as late as oral argument, concedes that it has not yet decided what the base year is and when the government's primary defense on the merits is that it was only late in the day that it discovered that the agency's carelessness led it for four years to use what it now calls the wrong figure. The lease is scheduled to end next year.

The second jurisdictional argument concerns the timeliness of plaintiff's request for reimbursement of additional taxes for part of 2008. The lease provides that "[f]ailure to submit the proper invoice and evidence of payment within" 60 calendar days after the tax is due to the local taxing authority "shall be a waiver of the right to receive payment resulting from an increased tax adjustment." App. to Pl.'s Mot. for Summ. J. A45. The parties agree that if Ms. Motamedi's November 13, 2008 letter was in fact sent to GSA, then the plaintiff's reimbursement claim with respect to the second half of 2008 is timely. If the first submission was her December 29, 2008 fax submission, then the submission is untimely.

The evidence is disputed. Ms. Motamedi has filed an affidavit in which she attests to having sent the November 13 letter by certified mail. A copy of the letter shows a certification number. She placed the letter in the company's outgoing mail. She did not receive the green copy of the certification showing receipt, however. In her deposition, Ms. Motamedi testified that it was not unprecedented for her not to receive the green receipt copy and yet still be certain that the letter was received, because she would have received a payment in response to the letter. In addition, there is some evidence that the agency had prior experience with receiving but not acknowledging certified mail, which may have prompted the agency to go to a system of electronic faxing of bills.

10

Defendant refuses to acknowledge the timeliness of the reimbursement request for the last two months of lease year 2007-2008 because, in its view, all evidence of timely filing is circumstantial. There is no direct proof of receipt. It concludes that the issue is therefore not ripe for summary judgment. The government does not offer any reason to think that Ms. Motamedi is not telling the truth, but the court is not in a position to make ultimate fact findings about whether the bill was submitted without drawing inferences from indirect proof. We thus agree with defendant that summary judgment cannot be granted for plaintiff with respect to the claim for tax reimbursement for the second half of 2008. Rule 56(a) of the Rules of the Court of Federal Claims ("RCFC"); *see Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986).

This does not end the analysis, however. The dueling cross motions are still relevant with respect to the first part of lease year 2007-2008.

II.     The Merits of Plaintiff's Claim

Paragraph 3.2 of the lease provides for an annual tax adjustment. It allows plaintiff to assess GSA for its proportional share of increases in real estate taxes (or requires it to credit GSA if taxes go down). Adjustments are calculated against base year taxes, which are defined as either: taxes for the first 12-month period coincident with full assessment, or an amount negotiated by the parties that reflects an agreed-upon base for a fully assessed value of the property.

Presumably the first definition would require actual proof of when the property was first fully assessed. The second definition is the one offered by plaintiff. Woodies contends that the parties did negotiate and agree upon the base year for a fully assessed value. Defendant has no figure or tax year of its own to offer, but it disagrees with plaintiff's proffer of the period June 1, 2005 through May 31, 2006, on the ground that the parties did not sufficiently focus on determining the first year of fully assessed value. The government's argument, in effect, is that there really is no alternative way to fix the base year. The parties, according to the government, can only agree to a compromise number if in fact it does reflect a fully assessed value.

Under plaintiff's preferred approach, the parties do not need to trouble themselves with what the first 12-month period coincident with full assessment actually was, because they selected option two, namely, they agreed upon and executed a supplemental lease agreement regarding the base year amount.

Plaintiff claims that, pursuant to the lease, the parties negotiated a base year value of $2,125,382, which is the dollar amount of real estate taxes assessed from June 1, 2005 through May 31, 2006. There is good evidence to support plaintiff's assertion.

As described in detail above, Ms. Motamedi initiated communication with CO Berelson so that GSA would process Woodies' request for real estate tax reimbursement pursuant to the lease. Mr. Berelson and Terez Haynes put Ms. Motamedi in contact with Ms. Rinehardt, who was identified as the budget analyst "responsible for the leases." App. to Pl.'s Mot. for Summ. J. A346-47. Ms. Rinehardt was authorized to communicate with and assist Woodies in processing the request for real estate tax reimbursement. CO Berelson was copied on most of the communications between Ms. Motamedi and Ms. Rinehardt.

Initially, Ms. Motamedi proposed using calendar year 2005 as the base year for calculating the increase in real estate tax. In response, Ms. Rinehardt offered a methodology that used the first year of the lease, June 1, 2005 through May 31, 2006, as the base year and sent Ms. Motamedi SLAs which reflected this approach. The value of the base year that Ms. Rinehardt proposed for Lease 1809 was $2,125,382. Ms. Motamedi did not disagree with Ms. Rinehardt's approach but had difficulty replicating the calculations that yielded the government's figures for the other leases. In order to reach an agreement on the tax base year, Ms. Motamedi suggested that the parties meet.

Ms. Motamedi, Mr. Berelson, Ms. Rinehardt, and other representatives of plaintiff and GSA met together on July 17, 2008. At the meeting, Ms. Motamedi told Mr. Berelson that use of the first year of the lease (June 1, 2005 through May 31, 2006) would be administratively burdensome, but plaintiff would accept it.

Then, the parties executed SLA No. 4. On February 16, 2009, plaintiff received the original of SLA No. 4, which was signed by CO Parrish. This SLA was then executed by Woodies' authorized representative and retained in plaintiff's files. The one-page SLA contemplates a bilateral amendment to the lease. It provides that it is an "AGREEMENT, made and entered into . . . between" the parties "to amend the [] Lease." *Id*. at A183. The sole purpose of the SLA at issue was to fix the comparison (current) year taxes as against the base year, which in each case was stated to be the period 2005-2006. GSA

paid plaintiff in the exact amount reflected as due from the government in SLA No. 4.  The CO signed the subsequent SLAs for the next three years.

Defendant argues that none of these discussions or exchanges are of any contractual consequence.  The supplemental lease agreements are dismissed as unilateral government actions with no significance to the parties' relationship because they were, according to the government, neither bilateral amendments nor reflective of negotiations leading to an agreed-upon base year.  If there were anything to disavow, the government asserts that it would be the result of a mistake because the building was not at "full assessment."

One wonders why the agency would bother to send the SLAs in that event. When asked in his deposition whether GSA's execution of SLA No. 4 represented a "determination that 2005 was the correct base year, subject to the terms of the lease," Mr. Berelson responded, "No." App. to Def.'s Cross-Mot. for Summ. J. 19.  Instead, "[i]t was an incorrect determination of the base year. It was not negotiated."  *Id.*  His signature on the SLAs he dismisses as an "administrative issue[]." App. to Pl.'s Mot. for Summ. J. A287.  He admitted, however, that "there was a series of e-mails and discussion back and forth between [Ms. Rinehardt and Ms. Motamedi] in terms of the–calculating tax adjustments and what bills would be needed."  *Id.* at A284.[6]

---

[6] In his deposition, Mr. Berelson characterized the discussions as follows:

Q.  And in response, the government proposed that they use tax year rather than calendar year; correct?
A.  I don't – my understanding is that the government suggested the methodology contained in the lease, which is using the first twelve months commensurate with full assessment . . .
. . . .
Q.   And is it also your understanding that Ms. Motamedi ultimately agreed to use that tax year [2005-2006] for the submission?
A.  My understanding is that when [Ms. Motamedi] was advised of the language in the lease that she did not take issue with the language in the lease, so the methodology.
Q.  And so she consented to allowing the government to utilize the tax year of June 1, 2005 to May 31, 2006.

Despite the fact that Ms. Rinehardt was designated by the CO as the proper contact person for discussions about the correct base year, Mr. Berelson dismisses her as a "lower-level" budget analyst, who "did not fully understand the language in the lease" and was, in any event, without contracting authority. App. to Def.'s Cross-Mot. for Summ. J. 19-20.   Mr. Berelson was copied, however, on a number of the emails circulating between Ms. Rinehardt and Ms. Motamedi, was present at the discussions on July 17, and signed some of the SLAs incorporating the government's own figure for the base year, which the plaintiff now relies upon.

We reject the government's argument that the parties did not negotiate an agreed-upon base year for a fully assessed value of the property.   It is undisputed that Ms. Rinehardt was designated to negotiate with Woodies on the precise question of what would be used as the base year for calculating tax increases, that Ms. Rinehardt, Mr. Berelson, Ms. Motamedi and others exchanged numerous emails and met in person to discuss the precise question of what year to use as the base year, that Mr. Berelson had contracting authority, that plaintiff agreed to use the government's proposed base year, that the parties' agreement was memorialized in SLA No. 4, and that the parties' subsequent conduct confirmed their agreement repeatedly.   *See Am. Red Ball Int'l, Inc. v. United States*, 79 Fed. Cl. 474, 478 (2007) ("Plaintiffs must establish four elements of a contract with the United States: (1) lack of ambiguity in offer and acceptance, (2) mutuality of intent to contract, (3) actual authority to bind the government, and (4) consideration.").   Plainly, the government offered both orally and in writing to establish the base tax year as June 1, 2005 through May 31, 2006.   Plaintiff accepted both orally and in writing the government's offer and the parties' subsequent conduct confirmed their agreement.

---

A.  I'm not aware that she consented. . . .  I believe she was advised by Ms. Rinehardt of what the lease said in terms of how taxes would be calculated.

Q.   Well, there was definitely a discussion between Ms. Motamedi and Ms. Rinehardt about how the . . . base taxes were going to be calculated; correct?

A.  Yes.  There was a series of e-mails and discussion . . . .

*Id*. at A283-84.

In response to plaintiff's assertion that the parties negotiated a base year under option two, defendant emphasizes that "the plain language of the provision in question makes clear that any negotiated base year tax amount must reflect an agreed upon base for a fully assessed value of the property." Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. 2. The government suggests that the negotiating was insufficient to demonstrate to its satisfaction that the parties had really "discussed or considered" the "assessed value of the property." *Id.* at 3. After reviewing the emails and documents exchanged, the government concludes that "there was no mention by any representative of either party as to whether or not the property was considered to be fully assessed." *Id.* at 4.

We disagree. Every time the issue arose as to how to calculate the government's share of the taxes, the parties refer to taxes for the "base year." The lease defines base year taxes as being one of two things: either the taxes for the first year coincident with full assessment or an amount negotiated by the parties that reflects an agreed-upon base year for a fully assessed value. References to base year taxes therefore can *only* refer to those taxes paid during the year in which full assessment *actually* occurred or to an amount which reflects the parties' compromise figure. Either way, all of the email traffic and document exchanges of necessity revolve around the calculation of billing for tax changes. The court is unaware of any reason for the parties to negotiate what constitutes the base tax year other than its use as the subtrahend in a simple calculation of changes in the amount of real estate taxes from year to year, and the government suggests none.

The figures on which plaintiff relies today thus were initially proposed by GSA for no purpose other than implementing the tax adjustment under clause 3.2 of the lease. Plaintiff agreed to them. The parties were within their contract rights to agree on a base year for calculating real estate tax adjustments. Once having done that, GSA cannot unilaterally decide that it is unhappy with that agreement. It is useless to suggest that the negotiations did not focus sufficiently on whether the building was at "full assessment." Mr. Berelson admits that he had available all the facts he needed to conclude that the true value of the improvements had not yet been incorporated into the tax assessment as of the 2005-2006 time period. It is not up to the court to rescue

the government from its poor judgment.[7]  We conclude as a matter of law that the parties negotiated an agreed-upon base year for a fully assessed value of the property, the period from June 1, 2005 through May 31, 2006.

Although not clearly articulated as an alternative defense, the government's briefing also suggests that, even if it agreed to the 2005-2006 period as the base tax year, it did so by mistake and that it should be excused from its mistake.  In order to prove a unilateral mistake, the government must establish the following:

> (1) mistake by one party, not bearing the risk of such mistake, as to a basic assumption on which [it] made the contract;
> (2) that has a material effect on the agreed exchange of performance; and
> > (a) the effect of the mistake is such that enforcement of the contract would be unconscionable; or
> > (b) the other party to the contract has reason to know of the mistake.

*Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20, 91 (2000).  As discussed above, we are satisfied that there was no evidence of a mistake.  GSA negotiators knew precisely what they were doing by using the 2005-2006 time period.  To give them the benefit of the doubt, however, they apparently assumed, without checking, that the property had been reappraised after all the lessor improvements had been made.  That assumption, even if incorrect, easily could have been tested by referring to public records.  The possibility that GSA elected to move forward without determining the state of the appraisal process does not constitute grounds for voiding the agreement.  There is no suggestion that the plaintiff had reason to know of the mistake, or was at fault for the mistake, or that the mistake was mutual and a basic assumption of the selection of 2005-2006 as the base year.  *See generally* Restatement (Second) of Contracts §§ 150-154 (1981) (summarizing the law about a mistake in the formation of a contract).

---

[7] The facts here are unlike those in *Jemal's Lazriv Water, LLC v. United States*, 114 Fed. Cl. 512, 514 (2013), where the parties stipulated that the lease defined the base year as "the first 12-month period of the lease term coincident with full assessment."

Finally, we note that the government does not forthrightly assert that the lease gives the agency the right to unilaterally determine the base tax year, although its argument hints at such a right.[8] If it did make that argument, we would reject it as inconsistent with the plain language of the lease.

_____

[8] When shown the version of SLA No. 4 signed by a Woodies representative, Mr. Berelson made the following remarks:

> A.  The document has – the second page has a lessor signature on a unilateral government document, so that is not an official – at least this version is not an official copy.
> Q.  Why do you say that the second page is a unilateral government document?
> A.  Real estate tax adjustments are unilateral government supplemental lease agreements.  We –
> Q.  That's only for administrative actions; correct?
> A.  For administrative actions, yes.
> Q.  And anything that would have changed the term of the lease would have required bilateral agreement; correct?
> A.  Correct.

App. to Def.'s Mot. for Summ. J. 18 (deposition of Joel Berelson).  Ms. Parrish, the CO who signed SLA No. 4, stated that a SLA is typically "a memorialization of previously agreed-upon terms.  It would be simply for the purposes of recording the payment." *Id*. at 37 (deposition of Michelle Parrish).  She also testified:

> Q.  Does [the government] typically use a supplemental lease agreement, or SLA, to establish the base year?
> A.  Yes.
> Q.  What is the general purpose of an SLA?
> A.  It's an amendment to a contract.
> Q.  And as an amendment to the contract, is it bilateral in the sense that both the Government and the lessor are expected to agree to it?
> A.  Not always.

App. to Pl.'s Mot. for Summ. J. A302 (deposition of Michelle Parrish).

17

**CONCLUSION**

We grant plaintiff's motion for summary judgment with respect to the first part of lease year 2007-2008.  We deny its motion with respect to the second part of that lease year because a question remains as to the timeliness of its request for reimbursement.  That issue must be tried.  We deny defendant's cross-motion in all respects.  The parties are directed to consult and propose in a joint status report a trial schedule for resolving the question of timeliness.  The report will be filed on or before March 31, 2014, and will propose a trial concluding no later than August 1, 2014.


s/ Eric G. Bruggink
Eric G. Bruggink
Judge