# In the United States Court of Federal Claims

No. 12-59C
(Filed: February 10, 2015)

* * * * * * * * * * * * * * * * * * * * * *
WOODIES HOLDINGS, LLC,

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant*.
* * * * * * * * * * * * * * * * * * * * * *

Contract; Trial; Mail Box Rule.

*Lynn E. Calkins,* Washington, D.C., with whom was *Thomas J. McIntosh*, Washington, D.C., for plaintiff.

*Martin M. Tomlinson*, United States Department of Justice, Civil Division, Washington, D.C., with whom were *Franklin E. White, Jr.*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Joyce R. Branda*, Acting Assistant Attorney General, for defendant.

---

OPINION

---

BRUGGINK, *Judge*.

This case presents a dispute between Woodies Holdings, LLC ("Woodies" or "plaintiff") and the United States, acting through the General Service Administration ("GSA"), about whether GSA is obligated by the terms of the lease to reimburse Woodies for a portion of real estate taxes Woodies paid to the District of Columbia in 2007 and 2008. In a previous opinion disposing of cross-motions for summary judgment, we held that GSA and Woodies agreed upon a value to be used for the base year figure in the real estate tax adjustment calculation. *Woodies Holdings, LLC v. United States*, 115 Fed. Cl. 204 (2014). That holding established GSA's obligation to pay plaintiff for the government's portion of the real estate taxes for the first part

of lease year 2007-2008.[1] *Id.* at 211-15. With respect to the second part of lease year 2007-2008, we reserved for trial the question of whether Woodies' representative timely submitted to GSA the documents showing that Woodies had paid the District of Columbia for its September 2008 real estate taxes, thereby satisfying the lease's notification requirement. On December 1, 2014, we had a trial on this limited issue. For the reasons set out below, we hold that Woodies timely submitted the notice and is therefore entitled to recover $37,837.34 for GSA's portion of the tax.

## BACKGROUND[2]

The 60-day period for timely submission of an invoice and proof of payment is central to resolution of this case. Clause 3.2 of the lease at issue provides the following:

> D. The Lessor shall furnish the Contracting Officer with copies of all notices which may affect the valuation of said land and buildings for real estate taxes thereon, as well as all notices of a tax credit, all tax bills, and all paid tax receipts . . . . All such documents are due within 10 calendar days of receipt except that the proper invoice and evidence of payment shall be submitted within 60 calendar days after the date the tax payment is due from the Lessor to the taxing authority. **FAILURE TO SUBMIT THE PROPER INVOICE AND EVIDENCE OF PAYMENT WITHIN SUCH TIME FRAME SHALL BE A WAIVER OF THE RIGHT TO RECEIVE PAYMENT RESULTING FROM AN INCREASED TAX ADJUSTMENT UNDER THIS PARAGRAPH**.

---

[1] There are several time cycles that run in the background of this case: 1) the lease year runs from June 1 to May 31; 2) the District of Columbia's tax year runs from October 1 to September 30; 3) the District of Columbia bills plaintiff for real estate taxes twice a year, once on March 31 for the period of October 1 through March 31 and then on September 15 for the period of April 1 through September 30; and 4) pursuant to the lease, plaintiff must submit to GSA the tax invoice and evidence of payment no later than 60 days after the payment is due.

[2] A more complete recitation of the facts is available in our previous opinion, which is reported at 115 Fed. Cl. 204.

JX 1 at WHL 061 (emphasis in original).[3]

At trial, we heard from two witnesses: Shahla Motamedi and Joel Berelson. Ms. Motamedi was Woodies' sole representative and real property administrator for the lease during the relevant period.[4] As the lease administrator, Ms. Motamedi was tasked with securing compliance with the terms of the lease, ensuring that the land owner maintained the building, and verifying that the tenant complied with its obligations under the lease, such as paying rent. Ms. Motamedi was also authorized to bill and seek payment from tenants for increases in operating costs, annual rent, or taxes. We find Ms. Motamedi to be credible, trustworthy, knowledgeable about lease administration with GSA, detail-oriented, and methodically organized.

Ms. Motamedi testified that she wrote a letter to GSA on or before November 13, 2008, but bearing that date, for the purpose of submitting proof that Woodies paid the September 15, 2008 real estate tax bill. It was sent using certified mail. According to Ms. Motamedi, she prepared the letter for mailing by typing the certified mail tracking number on the top of the letter, making several copies for sending and filing, placing the letter and attached documents in an envelope, addressing and sealing the envelope, affixing the cards for certified mail with return receipt request to the envelope,[5] sticking the certified mail tracking number on the green return receipt request, printing the

---

[3] "JX" refers to the Joint Exhibits admitted into evidence at trial and the page number refers to the bates number stamped on the document.

[4] Ms. Motamedi is actually employed by Douglas Development Corporation, which is a real estate management company that was hired to manage the Woodies building.

[5] Ms. Motamedi testified about her use of services offered by the United States Postal Service ("Postal Service") that provide the sender a record of mailing and delivery. She frequently utilized certified mail with an additional return receipt request. In order to signify that a letter is certified, part of a white card is attached to the envelope that bears a bar code and tracking number, while the other part of the card, which includes the replicated tracking number, is retained by the sender. Ms. Motamedi also used the return receipt service, whereby the Postal Service will furnish evidence of delivery on a green card that was attached to the original envelope, which bears the same certified tracking number, was signed for upon delivery, and returned to the sender through the mail.

appropriate amount of postage at the office postage machine, stamping the envelope with the postage, and, finally, placing the envelope in the outgoing mail tray,[6] which was next to the postage machine. After she completed this mailing process, Ms. Motamedi stapled the certified mail receipt to a copy of the letter and filed it.

Regarding the internal office mailing tray, Ms. Motamedi testified that there are two responsible and long-tenured employees who pick up the mail twice daily from the tray. The first pickup is at lunchtime, and this batch of mail is brought to the lobby of the building to an official United States Postal Service ("Postal Service") mailbox. The letters that accumulate after lunch are picked up later in the afternoon and brought to a nearby blue public mailbox. Letters are not left in the outgoing mail tray overnight. In Ms. Motamedi's experience, this internal mailing system is reliable and has never been the source of any problems in the past.

Ms. Motamedi was never presented with the receipt of certified delivery that she had requested in the mailing of the November 13, 2008 letter but did not immediately follow up with GSA. Her response to the fact that she had not received confirmation of delivery was informed by her previous experiences communicating with GSA. The lease at issue was not the only lease between Woodies and GSA that Ms. Motamedi administered. At this time, Ms. Motamedi was responsible for at least eighteen other GSA leases.[7] She testified, based on her extensive experience with GSA, that it was abnormal to receive the receipt confirming delivery when she sent a certified letter to GSA with a return receipt request. At trial, Ms. Motamedi was asked, "What percentage of the time do you get a return receipt from your mailings to GSA?" and responded, "One in ten." Tr. 36:19-21. This was the case despite the fact that Ms. Motamedi testified that she always sent bills or official communication to GSA via certified mail with return receipt requested. The lack of a return receipt did not give Ms. Motamedi much cause for concern,[8]

[6] This outgoing mail tray is the only one designated for mail being sent through the Postal Service, and it serves the entire Douglas Development Corporation office.

[7] Woodies was only one of Ms. Motamedi's clients that leased to GSA.

[8] When plaintiff's counsel asked if Ms. Motamedi had "experienced situations where you've sent [c]ertified [m]ail but it wasn't delivered for whatever reason," she replied, "[i]f it's not delivered, then it will  the whole envelope

however, because she would later receive an e-mail from a GSA employee stating that the letter had been received and that the matter was being acted upon.

Finally, Ms. Motamedi told the court about a 2008 change in procedure for submitting proof of tax payment to GSA. Beginning in March of that year, GSA began to transition from receiving requests for real estate tax reimbursements through the mail to receiving the requests through a centralized fax system. Throughout 2008, GSA received submissions by both methods: mail and fax. GSA notified lessors by letter in December 2008 that they should begin making submissions using the new fax system. While Ms. Motamedi testified that she did not receive a notice from GSA regarding the new submission procedure specific to the lease at issue, Ms. Motamedi was aware of the change in policy because of her administration of other GSA leases.

On December 29, 2008, Ms. Motamedi faxed to GSA the same proof of tax payment documents that she had originally included in her November 13, 2008 submission. She testified that, "[f]or all the other buildings that I had already mailed my letters and billings, I started faxing all of them once more one more time, and for this specific one . . . . I put an invoice according to what I had gotten in mail, and with the second set . . . faxed it, I faxed this one, too." Tr. 57:25-58:7. On the fax, she wrote "[t]hese were previously sent to the contracting officer." JX 6 at WHL 642. GSA received the faxed submission on December 29, 2008, but Mr. Joel Berelson, the GSA Contracting Officer ("CO") assigned to the lease at issue, rejected it as untimely on June 23, 2009. JX 7 at WHL 640.

Mr. Berelson was not the only GSA employee who had responsibility for administering the lease on behalf of GSA. GSA used a team approach to lease administration whereby several other lower level GSA employees shared responsibility for the routine administration of the lease at issue. These employees included: Budget Analyst Terez Haines, Realty Specialist Donald Scoggins, Budget Analyst Victoria Rinehardt, and prior to Mr. Berelson, Contracting Officer Michelle Parrish. Due to the team approach, Mr. Berelson was unable to answer many of the questions posed by counsel or the court

---

comes back to us." Tr. 55:14-18. According to Ms. Motamedi, the correspondence at issue was never returned to her or to Douglas Development Corporation.

from personal knowledge at trial. We therefore find Mr. Berelson to be candid but uninformed or lacking personal knowledge concerning whether GSA did, in fact, receive the November 13, 2008 letter.

Mr. Berelson testified that Budget Analyst Victoria Rinehardt was responsible for the daily administration of the lease at issue, which included "receiving documentation submitted by the lessor," whether by fax or mail, "and then reviewing that documentation and preparing the lease amendment for reimbursement." Tr. 86:12-15. Although Mr. Berelson admitted that he did not know exactly how mail communications were distributed within GSA, and, even though he conceded that the lessor was under no obligation to direct its submission to the specific Budget Analyst assigned to the lease, he asserted that any communication regarding the lease at issue should have been delivered to Ms. Rinehardt. Mr. Berelson was adamant that, if GSA actually received the November 13, 2008 submission, then Ms. Rinehardt would have been the eventual recipient and custodian of those documents even though he was aware that others within GSA had received misdirected mail and had personal experience with misdirected delivery of documents within GSA.

Specifically, Mr. Berelson recalled that prior to the new fax system, he received at least one mailed-in document that should not have been delivered to him. When this happened, Mr. Berelson determined who was the proper GSA recipient and hand delivered the document to the correct individual. Mr. Berelson further admitted that it was "not uncommon for mail to be addressed to a contracting officer [who was] no longer responsible for a lease or a realty specialist" who was not the proper recipient, particularly as reassignments were common within GSA. Tr. 131:24-132:1. According to Mr. Berelson, the centralized fax system was intended to address this issue of misdirected communications because one administrative employee was tasked with receiving the faxes and identifying the proper recipient based on an updated database of administrators assigned to specific leases.

Additionally, the parties stipulated to the following:

> Prior to establishing the fax system, GSA received complaints from lessors that they had submitted material that GSA had no record of having received and no way of definitively verifying whether the material was sent or received. According to Carla Walker, a GSA budget analyst intern who helped establish the fax system and then monitored and tracked submissions through

> the fax system, GSA had "no way to track whether or not [the lessors] actually really had sent them."

Stipulation ¶ 10. Mr. Berelson was unsure about how mail was tracked and delivered within GSA prior to establishment of the centralized fax system.

Mr. Berelson testified that, before he denied Woodies' submission for untimeliness, Ms. Rinehardt advised him "that there was a search through the lease file and the payment file and that there was not evidence of a timely submission by the lessor." Tr. 92:9-11. The lease file, which was the official GSA file containing the lease, amendments, and supporting documentation, was one of two places where the November 13, 2008 submission could have been stored. The other was the payment file, which was a working file kept by Ms. Rinehardt. However, Mr. Berelson did not know which file Ms. Rinehardt had checked in order to reach the conclusion that Woodies had not timely submitted the proof of tax payment. Tr. 93:9-12. Mr. Berelson also did not know whether Ms. Rinehardt had checked if the missing document had been delivered to one of the other members of the team. Instead, he testified that he assumed she had conducted a thorough check for a timely submission, but he had not pressed Ms. Rinehardt for details or searched himself.[9] Mr. Berelson also stated, "I have no way of knowing" if the November 13, 2008 letter was misdirected within GSA. Tr. 98:4.

With these facts before us, we endeavor to resolve whether Woodies has proved that it timely submitted the November 13, 2008 proof of tax payment. If it did, GSA is obligated to reimburse plaintiff for the tax differential for the remaining two months of lease year 2007-2008.

---

[9] Mr. Berelson also did not know whether the files for the other GSA leases within the Woodies building had been searched for the missing submission. Mr. Berelson was asked "why would it not have been logical to look at the file folder for [lease numbers] 1641 or 1751 or 1838 because you have a common billing for four different leases? Isn't it possible that [] one bill could have been stuck in one of those other files?" Tr. 108:20-24. Mr. Berelson replied, "It could have been." Tr. 108:25. When pressed further as to whether there "were . . . standing orders that when you get a single billing for multiple leases, the first thing you do is make copies?" Tr. 109:2-4. To which he answered, "I'm not aware of how that works." Tr. 109:5.

## DISCUSSION

We find that Ms. Motamedi did, in fact, place the postage-stamped and properly addressed envelope containing the letter and proof of tax payment in the outbox of Woodies' internal mailing system on November 13, 2008, and that, based on the routine practice of her office, the mail that was placed in the outbox tray was placed in a Postal Service box.[10] Thus, Ms. Motamedi did, in fact, mail the certified return receipt requested letter on November 13, 2008.

Normally, the fact that Woodies mailed the letter using the Postal Service would entitle it to a presumption of delivery regardless of GSA's assertion of non-receipt. *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884) ("If a letter properly directed is proved to have been either put into the post-office or delivered to the postman, it is presumed, from the known course of business in the post-office department, that it reached its destination at the regular time, and was received by the person to whom it was addressed."). However, the common law mailbox rule presumption is rebuttable with evidence that the letter was never received. *Rios v. Nicholson*, 490 F.3d 928, 931 (Fed. Cir. 2007). "If there is opposing evidence that the letter was not received, the trier of fact must weigh the evidence 'with all the other circumstances of the case' to determine whether the letter was actually received." *Tantum v. MSPB*, 482 F. App'x 554, 556 (Fed. Cir. 2012) (citing *Rios*, 490 F.3d at 931).

Defendant argues that plaintiff is not entitled to the mailbox rule presumption of delivery because it never received the return receipt card that it requested, which would have confirmed delivery. In other words, defendant proffers the non-existence of the requested receipt of delivery to establish the fact that the November 13, 2008 letter was not delivered to GSA. The rationale is that, if a letter is sent by certified mail and the sender does not receive the confirmation of delivery from the Postal Service, the sender is on notice that there may have been a problem with delivery. *Moya v. United States*, 35 F.3d 501, 504 (10th Cir. 1994). Several Courts of Appeal also have held that the lack of a return receipt when a letter was sent certified with return receipt requested rebuts the presumption of delivery. *Busquets-Ivars v.*

---

[10] Circumstantial evidence of mailing, including the customary mailing practices used in the sender's normal course of business, is sufficient for purposes of the mailbox rule. *Custer v. Murphy Oil USA, Inc*, 503 F.3d 415, 420 (5th Cir. 2007); *Rios*, 490 F.3d at 933; *Lopez v. Gonzales*, 468 F.3d 81, 85 (2d Cir. 2006); *Davis v. U.S. Bancorp*, 383 F.3d 761, 766 (8th Cir. 2004).

*Ashcroft*, 333 F.3d 1008, 1009 (9th Cir. 2003); *Moya*, 35 F.3d at 504; *Mulder v. Comm'r*, 855 F.2d 208, 212 (5th Cir. 1988); *McPartlin v. Comm'r*, 653 F.2d 1185, 1191 (7th Cir. 1981).

In addition to the non-existence of the receipt card, defendant argues that, because it is entitled to a presumption of regularity in its record-keeping, its inability to locate the November 13, 2008 letter in its records overcomes the presumption of receipt. "The 'presumption of regularity' supports official acts of public officers. In the absence of clear evidence to the contrary, the doctrine presumes that public officers have properly discharged their official duties." *Butler v. Principi*, 244 F.3d 1337, 1340 (Fed. Cir. 2001); *see Chrysler Corp. v. United States*, 604 F.3d 1387, 1380 (Fed. Cir. 2010). Specifically, defendant asserts that, because its records are presumed to be regular and correct and because its records contain no evidence that GSA received the November 13, 2008 submission, then GSA did not receive the proof of tax payment until Woodies submitted it via fax on December 29, 2008, which was untimely.

Neither the use of certified mail nor a presumption of regularity helps the agency in this case. There is clear evidence to rebut defendant's presumption of regularity. First, there were the problems at GSA that necessitated the implementation of the centralized fax system. Second, there was the team approach and the history of at least two contracting officers having been assigned to this lease, which increased the number of potential recipients within GSA. There were multiple files for each lease and several other lease files related to the Woodies building that could have shared the same proof of tax payment. Finally, Mr. Berelson was unable to provide assurances that he had personally searched any of these potential resting places for the missing submission before concluding that the fax submission was untimely. The internal mail delivery system within GSA was unreliable, at best, during the period of time when the November 13, 2008 letter went missing. Mr. Berelson could not recall doing anything to investigate the location of the initial submission, nor did he follow up with subordinate employees about whether the November 13, 2008 letter may have been misplaced or misfiled. Under these circumstances, the government is not entitled to the presumption of regularity in its business practices.[11]

---

[11] Even if the government had been entitled to the presumption of regularity, that presumption "alone, cannot overcome another presumption." *Rios*, 490 F.3d at 933. In other words, the presumption of regularity is only relevant if

In addition, any evidentiary weight which might normally attach to the non-receipt of the certified mail form is inapplicable here in view of the clear evidence that the agency routinely ignored the basic rules of that system: it often did not sign for the mail or return the receipt. Ms. Motamedi testified that 9 out of 10 times she did not receive a green return receipt when she sent certified mail to GSA, despite later confirmation that the letter had actually been delivered to GSA.

There is thus nothing entitled to evidentiary weight to rebut the presumption that the first, certified letter was actually received. As Judge Skelton of the Court of Claims observed:

> A presumption cannot be overturned or rebutted by speculation or suspicion. It can only be destroyed or overcome by convincing and uncontradicted evidence to the contrary which clearly and distinctly establishes a fact so that reasonable minds can draw but one inference. In addition to the foregoing, to overcome the strong presumption of the arrival of a letter in due course of the mails, the countervailing evidence must show the contrary to be true by direct and positive proof of affirmative facts.

*Charlson Realty Co. v. United States*, 384 F.2d 434, 444-45 (Ct. Cl. 1967) (internal citation omitted).

We are satisfied that the November 13, 2008 letter was properly stamped and addressed and placed in the United States mail, and we can thus presume that it was delivered to GSA within a short period of time, making it timely to trigger Woodies' rights under the lease to claim reimbursement. There is no credible evidence to the contrary.

## CONCLUSION

The parties agree that the amount in controversy for this narrow issue is $37,837.34. We find that Woodies timely submitted the November 13, 2008 letter with attached proof of payment and is therefore entitled to recover $37,837.34, GSA's proportional tax burden for the 2 month period originally denied as untimely. We previously held that plaintiff is also owed GSA's tax

---

we find that the presumption of delivery does not apply. *See id.* at 933-34.

share for the other ten months of the 2007-2008 lease year. Altogether, Woodies is hereby awarded a total principal amount of $227,024.04, GSA's portion of the 2007-2008 real estate taxes for the lease at issue. Plaintiff is also entitled to interest on this amount under the Contract Disputes Act, 41 U.S.C. § 7109(a)(1) (2012), from the date of its claim, June 2, 2011. The Clerk's Office is instructed to enter judgment accordingly.

s/ Eric G. Bruggink
Eric G. Bruggink
Judge